UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHAPEL MORTGAGE CORPORATION, a New Jersey corporation,<br><br>                      Plaintiff,<br>      v.<br><br>EVERETT STOWELL, an individual; ROBERT MAYBERRY, an individual; ISAAC PALMER, an individual; and DOES 1–10,<br><br>                      Defendants. | No. C04-2073L<br><br>ORDER ON BOTH PARTIES' MOTIONS FOR SUMMARY JUDGMENT |

This matter comes before the Court on "Defendant Stowell's Motion for Summary Judgment" (Dkt. # 27) and "Plaintiff Chapel Mortgage Corporation's Motion for Summary Judgment and Supporting Memorandum" (Dkt. # 35). Chapel alleges that Stowell committed fraud in securing a home loan, a charge that Stowell does not contest. Rather, Stowell argues that his fraud was not the proximate cause of Chapel's loss. For the following reasons, Stowell's summary judgment motion is denied and Chapel's summary judgment is granted as to

ORDER ON BOTH PARTIES'
MOTIONS FOR SUMMARY
JUDGMENT

Stowell's liability and denied as to the amount of damages.

## I. Background

In March, 2003, Everett Stowell made false statements on a loan application in order to secure a home loan mortgage from Chapel Mortgage Corporation. Among other fabrications, Stowell averred that he was going to live on the property for which he sought the home loan. He received two loans: A primary mortgage for $396,900 and a secondary mortgage for 170,100, for a total of $567,000, which was the appraised value of the property. Two of Stowell's friends planned to refurbish the property and resell it for a quick gain in the booming Seattle real estate market. They paid him at least $10,000 for his cooperation.

Chapel then packaged the loan with similar loans and sold them in May, 2003 on the secondary market to the Winter Group, a securitization company. Per its agreement with the Winter Group, Chapel performed servicing on the loan until August, 2003, during which time Chapel learned that Stowell had lied on his loan application about living at the property. Shortly thereafter, Stowell went into early payment default on his loan, triggering a compelled repurchase provision between Chapel and the Winter Group. The Winter Group first exercised this provision in March, 2004.

Prior to consenting to the repurchase, Chapel assessed the value of Stowell's loan for the purpose of sale on the secondary market.[1] Because properties purchased for investment (as opposed to residential) purposes are assessed at a 70% loan-to-value (LTV) ratio, and Stowell was not living at the property, he should have received a loan of $396,900 for the purchase of the property in question. Because that percentage reflects how mortgage industry players assess

---

[1] Chapel provides funds for mortgages by drawing on a warehouse line of credit, which it repays after it sells the loans on the secondary market. As is typical in the industry, it does not have its own investment capital. Therefore, a loan is worth to Chapel only its value on the secondary market.

ORDER ON BOTH PARTIES'
MOTIONS FOR SUMMARY
JUDGMENT                                  -2-

risk and value collateral when a loan is made for investment purposes, this lower amount was essentially how a potential secondary market buyer would value Stowell's mortgage instrument, according to Chapel's reasoning. This represented a 30% discount from the amount of the loan. Therfore, in lieu of undertaking the transaction costs to repurchase and resell Stowell's mortgage, Chapel simply refunded to the Winter Group approximately 30% of what it paid, which (with some additional costs) totaled $176,957.57. This transaction occurred in August, 2004, after several months of negotiation.

In the meantime, in April, 2004, the Winter Group began foreclosure proceedings against Stowell. Again blindly following his friends' guidance, Stowell quitclaimed his interest in the property to an organization called SFN Investments, an organization about which the parties have been unable to provide information. This maneuver stayed the foreclosure efforts for several months. The Winter Group again contacted Stowell about foreclosing on the loan in August and October of 2004.[2] Finally, in December, 2004, the property was sold and the loan obligations apparently were paid in full.

Chapel then sued Stowell for fraud for the $176,957.57 payment it undertook to avoid the compelled repurchase. Under Washington law, a plaintiff alleging fraud most show: "(1) A representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom it is made; (7) the latter's reliance on the truth of the representation; (8) his right to rely upon it; (9) his consequent damage." Webster v. L. Romano Eng'r Corp., 178 Wash. 118 (1934).[3] Chapel has proven these

---

[2] Why the letters in the record are addressed to Stowell and not to the mysterious SFN Investments is not explained.

[3] This action was brought in federal court pursuant to diversity jurisdiction. 28 U.S.C. § 1332(a). It is uncontested that Washington law governs.

ORDER ON BOTH PARTIES'
MOTIONS FOR SUMMARY
JUDGMENT                              -3-

elements "by clear, cogent and convincing evidence." Sigman v. Stevens-Norton, 70 Wn.2d 915 (1967). Moreover, Stowell concedes that he committed the fraud. The parties only dispute whether Stowell's fraud was the proximate cause of Chapel's damages.

**II. Discussion**

*A. Summary Judgment Standard*

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. The party seeking summary disposition of the case "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." Id., 477 U.S. at 324.

*B. Proximate Cause*

1. Chapel's Argument

In its briefs, Chapel relies on language from McInnis & Co. v. Western Tractor & Equipment Co., to argue that Chapel can receive in tort the damages that "follow as the natural and ordinary consequences of the wrong." 67 Wn.2d 965, 971 (1966). In that case, Merville McInnis sued Western Tractor in tort for fraud and in contract for breach of warranty because Western had falsely represented to McInnis that a tractor he purchased was "new, unused and the latest model." Id. at 967. Instead of seeking rescission of the contract, McInnis found a third party buyer and then sued Western for the difference in price. McInnis won on the

ORDER ON BOTH PARTIES'
MOTIONS FOR SUMMARY
JUDGMENT                                -4-

contract claim and Western appealed. The Washington Supreme Court held that the contract claims were barred under the merger doctrine. On remand, the trial court found in tort for fraud in the inducement. Applying the "benefit-of-the-bargain rule" to the situation, the court deducted from McInnis's purchase price the price that McInnis obtained from the third party buyer, and awarded the remainder to McInnis from Western in damages for the fraud.[4] The "natural and ordinary consequences" language upon which Chapel relies actually attaches to the court's decision to also award the cost of McInnis's flight to Japan, where he traveled to sell the tractor.

2. Stowell's Argument

Stowell originally argued that under Washington's "independent business judgment" rule, Stowell was insulated from a tort action. In that case, when a plaintiff landowner concluded that it would be fruitless to attempt to comply with a new federal regulation on his recently purchased land, the landowner abandoned the property and sued the city of Seattle for negligently causing a delay in the construction process which subsequently subjected the landowner to the new regulation. King v. City of Seattle, 84 Wn.2d 239 (1974). The court denied King's damage award, reasoning that his independent business judgment resulted in the loss. Id. at 252. The Washington Supreme Court later rejected the rule in City of Seattle v. Bloom, concluding that the approach might (1) exclude from recovery "valid attempts to

---

[4] It is unsurprising that, given the structure of Chapel's business, it would employ the analogy of the resale of a commodity to argue that the misrepresentations that induced Chapel to approve the mortgage render the misrepresenter liable for the difference in price. From Stowell's perspective, Chapel's analogy would only be completely accurate if, when McInnis's third party buyer received the tractor, it magically turned out that it was in fact "new, unused and the latest model." This is because, after all, Stowell did make good on the contract. This distinction demonstrates the fundamental difference in the parties' approaches: From Chapel's perspective, it purchased from Stowell a chance at repayment, which, due to Stowell's misrepresentations, turned out to be lower than expected, and therefore less valuable in the secondary market; from Stowell's perspective, he sold a promise to repay, which, ultimately, he fulfilled.

ORDER ON BOTH PARTIES'
MOTIONS FOR SUMMARY
JUDGMENT                    -5-

mitigate damages," (2) discourage settlement, and (3) "operate as an absolution to tortfeasors." 134 Wn.2d 243, 258–59 (1997). The court concluded that the recoverability of damages must rest "on traditional principles of proximate causation whether or not a defendant was the cause of the injuries suffered and whether the duty to mitigate was met." Id. at 260. This approach resembles an argument from the King dissent, in which Justice Brachtenbach argued that the opinion's reasoning should have been, more simply, that: "[W]e will deny damages because these plaintiffs did not mitigate their damages." King, 84 Wn.2d at 254.[5]

3. Conclusion

It is clear that Chapel's negotiations and payment to avoid repurchase of Stowell's mortgage from the Winter Group were proximately caused by Stowell's intentional misrepresentations. Stowell's inability to foresee that Chapel's transaction with the Winter Group would result from his fraudulent application is irrelevant to the assessment of proximate cause. See Rikstad v. Holmberg, 76 Wn.2d 265, 268 (1969) ("The better considered authorities do not regard foreseeability as the handmaiden of proximate cause."). Stowell fraudulently induced Chapel to purchase a promise that Stowell was selling. Because of that fraud, the promise was worth less than Chapel had expected, and Chapel took a loss to sell it to a third party. The analysis, however, does not stop here.

*C. Reasonable Mitigation*

Although defendant's original invocation of the independent business judgment rule was correctly discredited, King and its progeny continue to provide guidance in this case. The independent business judgment rule was criticized because it might discourage valid attempts to

---

[5] In its "Correction and Amendment," Stowell concedes that the reasoning in King has been rejected. Stowell then quotes at great length from Schooley v. Pinch's Deli Market, 134 Wn.2d 468 (1998), a case exploring the extent of proximate cause with regard to a negligent sale of alcohol and a drowning in a pool.

ORDER ON BOTH PARTIES'
MOTIONS FOR SUMMARY
JUDGMENT                                -6-

mitigate damages, discourage settlement and absolve tortfeasors. Only the first of these considerations—discouragement of mitigation attempts—is relevant to the case at hand, because Chapel did not "settle" the dispute that arose from Stowell's fraud so much as it simply transferred the apparent risk and Stowell, the tortfeasor, was not absolved of his obligation to repay the loan. The analysis should focus, then, on Chapel's decision of how best to mitigate the damages caused by Stowell's tortious actions. This approach is in harmony with the Bloom criticism of King, which held that other than proximate cause, the analysis should examine "whether the duty to mitigate was met." 134 Wn.2d at 260.

In Sigman v. Stevens-Norton, the Sigmans, lenders, sought recovery from Stevens-Norton, a mortgage broker, for fraudulently inducing the Sigmans to loan money to Alice Monk by assuring the Sigmans that the loans would be secured by Monk's property. 70 Wn.2d at 916–18. As in McInnis, the trial court valued the damages due to the fraud using the benefit-of-the-bargain rule, "the difference in the value of the note and mortgage had it been as represented . . . and the [actual] value of such note and mortgage on the date the loan was made." Id. at 917. After realizing the fraud, the Sigmans released their mortgage and sued for the difference. Stevens-Norton countered that instead of selling the mortgage, the Sigmans "should have foreclosed [the] mortgage to further mitigate damages." Id. at 923. The Washington Supreme Court concluded that "[t]he evidence does not show that foreclosure costs, resale costs and other factors would have left anything for respondents. Like the trial court, we find that respondents acted reasonably." Id. The relevant analysis, thus, is whether the mortgage holders' efforts to mitigate the damages were reasonable.

In the instant case, the questions of the value of the mortgage and the mortgage holder's

ORDER ON BOTH PARTIES' MOTIONS FOR SUMMARY JUDGMENT                    -7-

adequate mitigatory efforts are the same.[6] Chapel claims that it essentially sold the loans to the Winter Group for approximately $396,900, or 70% of what Chapel paid for the mortgage, which would have been their actual value based on the fact that they were secured by a *investment* property that was valued at 567,000. Through the uncontroverted testimony of its loan servicing manager, Chapel showed that a borrower seeking to purchase an investment property would qualify for a loan equal to 70% of the value of the property. In other words, a loan for an investment property is worth 70% of the value of the collateral with which it is secured. In this regard, Chapel's steps to mitigate its damages appear reasonable.

The apparent ease with which the Winter Group received payment in full on the mortgage, however, undermines the proposition that Chapel correctly assessed the risk of Stowell's non-payment, and therefore the value of the mortgage instrument. Although Chapel is not under an obligation to take on the burden and cost of a foreclosure, it also may not recklessly release its contractual rights at a deep discount with the expectation that it can make itself whole in tort. For example, it might be argued that had Chapel inquired into the foreclosure value of the property, or the financial status of SFN Investments, it might have persuaded the Winter Group to accept a lesser rebate. Although it ultimately may be shown to be reasonable that Chapel valued Stowell's mortgage instrument at 70% based on its knowledge of the fraud, the Winter Group's quick receipt of full payment renders that conclusion impossible at this stage of the litigation.

### III. Conclusion

---

[6] This distinguishes the instant case somewhat from <u>Sigman</u>. In <u>Sigman</u>, although the subject of the dispute was only whether Sigman should receive the benefit of the bargain as determined by the purchase price of the mortgage minus the actual market value of the mortgage, Sigman actually released the mortgage for significantly less. The analogy is no less appropriate, however, because the subject of the appeal was only the amount as calculated by the benefit-of-the-bargain rule.

ORDER ON BOTH PARTIES'
MOTIONS FOR SUMMARY
JUDGMENT                                    -8-

For the foregoing reasons, IT IS HEREBY ORDERED that defendant Stowell's motion for summary judgment is DENIED. Stowell indisputably was the proximate cause of Chapel's loss. IT IS FURTHER ORDERED that plaintiff Chapel's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Stowell is liable to Chapel for damages for fraud. There remain, however, genuine issues of material fact as to the reasonableness of Chapel's mitigation efforts and thus the appropriate amount of the damages.

DATED this 5th day of December, 2005.

*/s/ Robert S. Lasnik*
Robert S. Lasnik
United States District Judge

ORDER ON BOTH PARTIES'
MOTIONS FOR SUMMARY
JUDGMENT                                    -9-